**Richard L. BEAMS, Plaintiff,**

v.

**Gale NORTON, Secretary of Department of Interior, Defendant.**

No. 03–4072–JAR.

United States District Court, D. Kansas.

Sept. 7, 2004.

Richard Lee Beams, Sunnyside, WA, pro se.

Jackie A. Rapstine, Office of United States Attorney, Topeka, KS, for Defendant.

---

### CORRECTED MEMORANDUM ORDER AND OPINION GRANTING MOTION FOR SUMMARY JUDGMENT[1]

ROBINSON, District Judge.

Plaintiff, who is pro se, brings this action alleging discrimination on the basis of sex, race, and retaliation in violation of Title VII of the Civil Rights Act of 1964 and age discrimination in violation of the Age Discrimination in Employment Act. This matter comes before the Court on defendant's Motion for Summary Judgment (Doc. 29). For the reasons stated below, defendant's summary judgment motion is granted.

### I. Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[2] The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[3] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[4]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a

---

**1.** On September 1, 2004, the Court entered a Memorandum Order and Opinion Granting Motion for Summary Judgment (Doc. 51), which inadvertently failed to address certain claims. The previous Order has been stricken and withdrawn (See Doc. 52). This Order replaces the Court's prior Order and serve as the final dispositive ruling in this case.

**2.** Fed.R.Civ.P. 56(c).

**3.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**4.** *Id.* at 251–52, 106 S.Ct. 2505.

lack of evidence to support the nonmoving party's case.[5] Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[6] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." [7] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[8] The Court must consider the record in the light most favorable to the nonmoving party.[9]

The Court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." [10]

■ In a pro se case, the pro se litigant's pleadings are to be liberally construed and are held to a less stringent standard.[11] Nevertheless, the Court is not authorized to become the advocate for the pro se litigant.[12] "Despite the liberal construction afforded pro se pleadings, the court will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues." [13] Moreover, plaintiffs are not excused from compliance with fundamental rules of procedure because they are proceeding pro se.[14] Pro se litigants must follow rules of procedure, including local rules.[15]

■ District of Kansas Rule 56.1 governs motions for summary judgment in this district, and it provides that "[a]ll material facts set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the statement of the opposing party." [16] Rule 56.1(b) provides as follows:

(1) A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and if applicable, shall state the number of movant's fact that is disputed.

(2) If the party opposing summary judgment relies on any facts not contained in the movant's memorandum, that party

---

5. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

6. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505.

7. *Id.*

8. *See id.*

9. *See Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

10. *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

11. *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

12. *Id.*

13. *Drake v. City of Fort Collins,* 927 F.2d 1156, 1159 (10th Cir.1991).

14. *Ogden v. San Juan County,* 32 F.3d 452, 455 (10th Cir.1994), *cert. denied,* 513 U.S. 1090, 115 S.Ct. 750, 130 L.Ed.2d 650 (1995).

15. *Green v. Dorrell,* 969 F.2d 915, 917 (10th Cir.1992), *cert. denied,* 507 U.S. 940, 113 S.Ct. 1336, 122 L.Ed.2d 720; *Campbell v. Meredith Corp.,* 260 F.Supp.2d 1087, 1097 n. 10 (D.Kan.2003).

16. D. Kan. R. 56.1(a).

shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner requires by subsection (a), above.

The duty to admit or deny factual allegations is not too complex of a duty to require of a pro se litigant.[17] Consequently, the failure of a plaintiff, pro se or otherwise, to admit or deny the veracity of facts set forth in a motion for summary judgment results in the facts being admitted.[18]

In this case, plaintiff has disregarded local rules, particularly the guidance provided by Rule 56.1. In response to defendant's motion for summary judgment, plaintiff has filed several documents,[19] but the only document which is even arguably responsive to defendant's statement of facts is entitled "Plaintiff's Objection to Defendant's Motion to Dismiss or for Summary Judgment." Plaintiff does not state whether he admits or denies defendant's factual contentions. Instead, he responds to some of defendant's statements of fact and ignores others. To the extent plaintiff has ignored defendant's facts, the facts will be deemed admitted.[20]

In those instances in which plaintiff does attempt to respond to defendant's statement of facts, his responses are likewise improper under local rules. Plaintiff's attempts to controvert defendant's facts, are neither concise nor do they refer with particularity to those portions of the record upon which plaintiff relies. For instance, in response to defendant's Statement of Fact No. 3, plaintiff offers a lengthy narrative in excess of two pages.

The narrative contains a few references to the record interspersed throughout, but these references do not refer with particularity to the record; instead, plaintiff refers the Court to Exhibit 1, pages 202–261. The Court will not sift through nearly sixty pages of exhibits in an attempt to divine a controverted factual issue. Similar inconsistencies with the local rules permeate plaintiff's response.

To the extent the Court can discern a "disputed factual issue" from plaintiff's response, the "fact" is not relevant, nor is it responsive to defendant's statement of facts. Much of plaintiff's time is spent summarizing his view that he should not have been fired because he was right and his supervisors and the other employers at the Bureau of Indian Affairs were wrong. No discussion concerns plaintiff's status as a male or retaliation based upon his filing of EEO Complaints. Plaintiff's lawsuit is one of employment discrimination based upon sex, and retaliation, not one of wrongful termination without cause. As such, plaintiff's opinion that his supervisors' work was deficient, while his work was superb, is irrelevant to this action and wholly unresponsive to defendant's summary judgment motion.

The "evidence" offered by plaintiff to support his factual contentions is similarly deficient. In a summary judgment response, a nonmoving party need not produce evidence in a form that would be admissible at trial.[21] It is well established, however, that a party cannot rely on unauthenticated documents to avoid summary judgment.[22] Nor may a party

**17.** *Hammad v. Bombardier Learjet Inc.*, 192 F.Supp.2d 1222, 1231, n. 6 (D.Kan.2002).

**18.** *Stegall v. Great Am. Ins. Co.*, 996 F.Supp. 1060, 1063 (D.Kan.1998).

**19.** The documents include: "Plaintiff's Objection to Defendant's Motion to Dismiss or for Summary Judgment;" "Statement of Facts;" "Background;" and "Argument."

**20.** These statement of facts include numbers 4, 24, 25, 27–33, 44–47, and 63–82.

**21.** *Stegall*, 996 F.Supp. at 1065 n. 7.

**22.** *IBP, Inc. v. Mercantile Bank of Topeka*, 6 F.Supp.2d 1258, 1263 (D.Kan.1998).

rely upon inadmissible hearsay, or "generalized, unsubstantiated, non-personal affidavits" to successfully oppose a properly supported motion for summary judgment.[23] Here, plaintiff offers Exhibit 1 consisting of records, which are purportedly "Office of Personnel Manual Investigation" administrative records. The records are neither verified, authenticated, nor otherwise indicative of an officially sealed set of records. The parties have stipulated to the admissibility of administrative records that form the basis of plaintiff's EEO complaints, but plaintiff's Exhibit 1 has no such stipulation. Yet another example is plaintiff's response to Statement of Fact No. 5. In his response, plaintiff refers the Court to testimony of some kind, but there is neither a cover sheet to indicate the nature of the proceeding during which the testimony arose or certification by the court reporter to verify the accuracy of the transcription. As such, the "testimony" is inadmissible. Although the Court will not discuss each evidentiary deficiency, such deficiencies abound as plaintiff's responses nearly all refer to unverified, unauthenticated documents or evidence constituting hearsay.

Plaintiff also filed a document entitled "Statement of Facts." This document fails to set forth plaintiff's factual allegations in separately numbered paragraphs. More importantly, plaintiff has not referred to the record, choosing instead to present a narrative of his version of events devoid of factual support. A conclusory, self-serving narrative falls far short of the requirements of D. Kan. R. 56.1(b). Furthermore, to the extent that plaintiff attempts to respond to defendant's statement of facts by referring the Court to his "Statement of Facts," his attempts are unavailing for "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings."[24]

The Court additionally notes that plaintiff, although proceeding pro se, is not wholly unfamiliar with summary judgment proceedings. This is the second lawsuit plaintiff has litigated in this Court. The first lawsuit, *Beams v. Norton*,[25] was resolved when defendant's motion for summary judgment was granted, and the judgment was upheld by the Tenth Circuit on appeal. In his prior lawsuit, the Court addressed plaintiff's submissions at the summary judgment stage and concluded that plaintiff's proffered facts were not facts at all, but bare allegations unsupported by Rule 56 evidence, and not responsive to defendant's factual contentions. Thus, plaintiff is aware that he must comply with D. Kan. Rule 56.1 and Fed.R.Civ.P. 56 to controvert defendant's factual contentions.

Finally, the Court observes that although plaintiff has provided no disputed issues of material fact, this alone does not make summary judgment proper, for plaintiff's burden to respond arises only if the motion is properly supported in the first instance.[26] "Accordingly, summary judgment is appropriate under Rule 56(e) only when the moving party has meet its initial burden of production under Rule 56(c)."[27] If the evidence presented by the moving party does not satisfy this burden, "summary judgment must be denied *even if no opposing evidentiary matter is presented.*"[28] Thus, if a nonmoving party fails to properly respond to a motion for summary judgment, the court must first

---

**23.** *Stegall,* 996 F.Supp. at 1065 n. 7.

**24.** *Phillips v. Calhoun,* 956 F.2d 949, 951 n. 3 (10th Cir.1992).

**25.** 256 F.Supp.2d 1203 (D.Kan.2003).

**26.** *See Reed v. Bennett,* 312 F.3d 1190, 1195 (10th Cir.2002).

**27.** *Id.* at 1194.

**28.** *Id.*

examine the moving party's submission to determine if it has met its initial burden of demonstrating that no material issues of fact remain for trial and that the moving party is entitled to judgment as a matter of law.

## II. Uncontroverted Facts

The following facts appearing in defendant's summary judgment motion, and which find support in the record, are uncontroverted as a matter of law.

Plaintiff, an American Indian male, brings this action alleging employment discrimination based upon his race or color, sex, and age under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (ADEA).[29] Plaintiff complains of four discrete employment actions: a reverse sex discrimination claim arising from his resignation as Soil Conservationist (BIA Complaint 91–031); a retaliation claim arising out of plaintiff's unsuccessful demand that he be placed back in the Soil Conservationist position (BIA Complaint 94–052); a claim for failure to employ based upon race, age and retaliation concerning plaintiff's 1994 application for another Soil Conservationist position (BIA Complaint 95–027); and a claim for retaliation concerning plaintiff's 1998 application for a Superintendent position (BIA Complaint 99–045).[30]

In an order entered February 26, 2004, United States Magistrate Judge K. Gary Sebelius granted plaintiff leave to amend his complaint and ordered that "the court and the parties shall treat all portions of the plaintiff's Civil Complaint (Doc. 1) related to BIA–95–027 as including a claim under the Indian Reorganization Act of 1934, also known as the Wheeler–Howard

Act, 25 U.S.C. § 461 et. seq."[31] Defendant then moved to dismiss or for summary judgment on this distinct claim. This Court, in an order dated July 30, 2004, granted defendant's motion.[32] Consequently, only BIA Complaints 91–031 (reverse sex discrimination claim), 94–052 (retaliation claim), 95–027 (age and race discrimination and retaliation claims) and 99–045 (retaliation claim) are now before this Court.

### Complaint of Discrimination BIA 91–031

Plaintiff, Richard L. Beams, was employed with the Department of Interior (DOI), Bureau of Indian Affairs (BIA) in Horton, Kansas, ("Horton Agency"), as a Soil Conservationist. One of the primary responsibilities assigned to plaintiff as the Soil Conservationist at the Horton Agency was the completion of farm plans or lease stipulations that were to be prepared before lease sales conducted by the Horton Agency. As the Anadarko Area appraiser prior to 1991, Brian Pogue utilized farm plans prepared by soil conservationists in the local offices such as the Horton Agency. Pogue encountered problems with plaintiff's work, namely that of the approximately seventy Horton Agency farm plans that were due for the 1989–1990 year, only twenty were completed in the Horton Agency, even though a workload of seventy farm plans is not considered heavy. Moreover, the twenty completed farm plans contained incorrect information. In counseling plaintiff for these deficiencies, Pogue determined that plaintiff's record keeping system was deficient and that plaintiff interfered with appraisal functions that were Pogue's responsibility. A former Superintendent of the Horton Agency,

---

29. *Beams v. Norton,* 256 F.Supp.2d 1203 (D.Kan.2004).

30. Pretrial Order ¶ 3.

31. Order Granting in Part and Denying in Part Plaintiff's Motion to Amend Complaint (Doc. 28).

32. *Beams,* 256 F.Supp.2d 1203.

Peggy Acoya, attempted to address these problems with plaintiff.

In May of 1990, Linda Saunders became the Acting Superintendent of the Horton Agency. In August of 1990, she was permanently assigned to that position. As the Superintendent, Saunders was responsible for carrying out the mission of the office and supervising its thirteen employees. Eight months prior to the proposed suspension, plaintiff was admonished, in writing, for inappropriately influencing a tribal official to sign a document without proper tribal council authority and for embarrassing Saunders in a formal council meeting. Because of plaintiff's actions, Saunders wrote a letter of apology to the Potawatomi Tribal Council.

Six months before the proposed suspension, plaintiff was instructed, in writing, to prioritize his job tasks to bring leasing activities current and to provide completed tasks to either Saunders or Brenda Shadwick, the acting realty officer. Three weeks after being so instructed, Shadwick prepared a written memorandum to Saunders concerning the continued inadequacy of plaintiff's work on lease stipulations. In addition, plaintiff was instructed to have all farm plans prepared before an October 1999 lease sale, but when the sale arrived, plaintiff had failed to complete most of the farm plans, and those that had been completed were inaccurate. A second lease sale was set for March 14, 1991. Again, plaintiff was instructed to complete the farm plans before the sale. To assure completion, Saunders directed plaintiff to make the farm plans his number one priority and to stop involving himself in other matters. Plaintiff was also specifically instructed that he was not to attend the actual lease sale because his primary focus and time was to be spent on the farm plans. As of the March 14, 1991 sale date, plaintiff had not completed any of the farm plans, and he attended the lease sale in direct contravention of Saunders' instructions.

On or about March 14, 1991, Saunders met with plaintiff again and instructed him to concentrate all of his time on completion of the farm plans. A week later, plaintiff checked out of the Horton office to review lease sale tracts on one of the reservations. Instead of staying on the reservation and completing the review, plaintiff visited the Jackson County Road Supervisor to discuss a road right-of-way closure. This closure was already being handled by the Horton Agency's Realty Division and plaintiff had been told to stay out of the matter. When plaintiff visited the Jackson County Road Supervisor, Ronald Karn, plaintiff gave him the impression that plaintiff had authority to make demands related to road right-of-ways. Karn contacted Saunders with concerns about plaintiff's authority and the demands plaintiff was making. Saunders confirmed Karn's concern that plaintiff did not have authority and this was not plaintiff's responsibility.

On March 22, 1991, Saunders and Shadwick, met with plaintiff to discuss the farm plans and the road right-of-way matter. During the meeting, plaintiff became defensive and walked out of the meeting. Plaintiff refused to return to the meeting even after being told that he would be considered insubordinate if he failed to comply. As a result of his actions, plaintiff was placed on administrative leave for the remainder of the day. Following plaintiff's conduct at the meeting, on March 22, 1991, Saunders consulted the Area Personnel Office for BIA about removing plaintiff as soil conservationist based on the continuous problems with his performance in that position. After a discussion with the personnel office, Saunders decided to propose a suspension of plaintiff instead of remov-

al. The proposed removal was not made known to plaintiff.

A few days later, Shadwick, with Saunders' concurrence, had to instruct plaintiff to comply with regulations limiting lease terms on land that was in an estate to no more than two years, even though plaintiff disagreed with the regulations. Just days prior to the proposed suspension of plaintiff, in early April of 1991, Saunders determined that plaintiff had inappropriately discussed with the Jackson County Sheriff the status of a certain leased tract on which plaintiff believed marijuana was being cultivated. Plaintiff interfered · in a realty matter even after being instructed to stay out of realty and concentrate solely on farm plans. This breach of duty was addressed in the proposed suspension.

On April 19, 1991, Saunders personally gave plaintiff the proposed fourteen day suspension in writing. · The proposed suspension provided that any actual suspension was left to the discretion of the Area Director and that plaintiff could respond to the proposal; in other words, the suspension was merely a proposal that could be challenged by plaintiff and was subject to the Area Director's final determination. Saunders asked plaintiff if he had any questions about the proposed suspension when she gave it to him. Plaintiff indicated he had no questions. Plaintiff acknowledged receipt of the suspension and never availed himself of the opportunity to respond to the proposal. Nor did he challenge the proposal or seek a final determination by the Area Director.

Saunders intended for the proposed suspension to correct plaintiff's conduct and performance, not to cause plaintiff to resign. After being presented with the proposed suspension, plaintiff immediately submitted written notice that he was resigning "as a result of [her] continued misrepresentation of the truth regarding [his] work and [his] intentions in [his] work."

Plaintiff made no reference to sex discrimination as a basis for his resignation. On April 19 and 22, 1991, the Administrative Officer at Horton, Galen Hubbard, met with plaintiff and encouraged plaintiff not to resign. Hubbard also suggested several alternatives to resignation so that plaintiff could continue his employment with the government, but plaintiff refused. While resigning, plaintiff never indicated that he was resigning because he believed he had been singled out. Instead, plaintiff said he was resigning because "sometimes a man's gotta do what he's gotta do." After plaintiff resigned, Saunders was willing to allow plaintiff to return as the Soil Conservationist in Horton, but plaintiff placed unacceptable conditions on his return.

Prior to receiving the proposed suspension, plaintiff visited the personnel office and told the Anadarko Area Personnel Officer, Evaline Gomez, that he was going to resign because he was "very unhappy. He did not like the Superintendent, he could not work with her, and she was just too pushy." Gomez asked that plaintiff not resign, but he resigned anyway.

·As Superintendent, Saunders was a demanding supervisor with all employees. Saunders also had to deal with work related problems with female employees. She gave a minimally successful performance evaluation to one female employee and counseled another female employee about deficiencies · in her performance. Unlike plaintiff, the other employees corrected the deficiencies addressed by Saunders. Saunders hired both male and female employees while at the Horton Agency.

After resigning, plaintiff filed an EEO complaint of sex discrimination, which became BIA Complaint No. 91–031, on June 26, 1991. On July 23, 1991, plaintiff's complaint of discrimination was accepted for processing with the following allegation:

You alleged discrimination based on sex (Male) when your employment conditions were made such that you were compelled to resign on April 19, 1991 (for example: Memorandum of Admonishment dated August 17, 1990; January 7, 1991, performance appraisal review; March 22, 1991, incident; and the Memorandums of Proposed 14 day Suspension dated April 19, 1991). (Constructive Discharge).

**Complaint of Discrimination BIA 94–052**

On January 14, 1994, plaintiff went to the Horton Agency and met with Linda Saunders, who was still the Superintendent there. Plaintiff brought a copy of a letter he received on December 16, 1993 from OPM. The letter stated as follows:

You have not previously, nor are you currently, debarred from employment.

. . . . .

Your application has been returned to OPM's Wichita Service Center where it will be available for referral to interested agencies as vacancies occur. Agencies have the responsibility to select the most highly qualified candidates from the applicants referred to them. Agencies are also responsible for adjudicating the suitability of applicants and eligibles for, and appointees to, Low Risk and Non–Sensitive positions, Public Trust Risk positions, and National Security positions within the agency. Your eligibility will provide you with full consideration for all positions for which you qualify. However, it does not represent a guarantee of an appointment.

Plaintiff believed this letter guaranteed him the position of Soil Conservationist at the Horton Agency. Plaintiff told Saunders that he wanted the Soil Conservationist's job, which had already been filled when Eugene Harter was selected for the position. Saunders had not seen the letter from OPM. Plaintiff showed Saunders the letter, and she read it while plaintiff was in her office. Saunders interpreted the letter differently than plaintiff; she understood the letter to mean that the agency decided if a person was suitable for employment with that agency. In addition, Saunders interpreted the letter to mean that if plaintiff applied for vacancies and was determined to be qualified, his name would be placed on a Certificate of Eligibles.

After reading the letter, Saunders explained to plaintiff that there were no vacancies at the Horton Agency. Plaintiff became argumentative and loud during the meeting, so argumentative in fact that Saunders felt threatened by his behavior. Saunders felt threatened and perceived her conversation with plaintiff as unproductive so she asked plaintiff to leave her office, not the building. She did not ask plaintiff to leave for any other reason such as prior EEO activity.

On March 1, 1994, plaintiff filed an EEO complaint of discrimination against BIA arising out of the incident with Saunders. On June 10, 1994, BIA accepted plaintiff's complaint of discrimination for processing of the following:

...Your complaint was filed against the Bureau of Indian Affairs...based on reprisal...

On or about December 16, 1993, you received OPM's decision which stated that you met the suitability standards for Federal employment. On January 14, 1994, you went to see the Horton Agency Superintendent regarding the OPM determination and the Soil Conservationist position, but she informed you that the Bureau of Indian Affairs had determined that you were not suitable for employment and when you asked her who in the BIA made that decision, she stated that she made that decision and ordered your removal from the building. Please review the accepted allegation

and bases carefully. If you have any questions or concerns regarding the accepted allegation, please notify this office within 10 calendar days of receipt of this letter. If we do not hear from you, the accepted allegation will be investigated as identified.

### Complaint of Discrimination 95–027

Plaintiff applied for the position of Soil Conservationist in Horton, Kansas, which became vacant when Eugene Harter resigned in March of 1994. This vacancy opened in March 14, 1994, and closed on April 4, 1994. The vacancy was advertised by the Andarko Area Personnel Office, not through OPM. When plaintiff filed for this vacancy, Evaline Gomez was the Anadarko Area Personnel Officer. According to plaintiff, Gomez encouraged him to file an EEO complaint when he resigned as Soil Conservationist in 1991.

In her capacity as the Anadarko Area Personnel Officer, Gomez had been delegated the authority to adjudicate suitability issues when an applicant applied directly to the agency. Gomez made a suitability determination based on the OPM Suitability Determination letter dated December 16, 1993, Quad Standard X118, FPM 338 and FPM 731–3, which authorized the agency to perform suitability determinations at the local agency level. Suitability is a term used to mean a requirement or requirements for employment by the federal government having reference to character, reputation, trustworthiness, and fitness of the person under consideration as it relates to the efficiency of the service. A person's misconduct or negligence in employment is a consideration in determining suitability.

Gomez determined that plaintiff was not suitable for the position of Soil Conservationist at the Horton Agency, and accordingly, she did not certify plaintiff to the selecting official for the most recent vacancy, which arose when Harter resigned. Gomez determined that plaintiff met the experience and education requirements for Soil Conservationist, but plaintiff did not meet the qualification requirements set forth in the Quad Standard X118 because as the former Soil Conservationist in Horton, plaintiff did not fulfill his assignments, did not comply with the missions of the agency, was not cooperative, and was disruptive and defiant. In making this determination, Gomez considered plaintiff's conduct in his prior employment as Soil Conservationist at the Horton Agency.

In 1994, Jeannie Cooper was an Employee Relations Specialist with the Anadarko Area Personnel Office, and she was supervised by Gomez. After plaintiff applied and during the time that Gomez determined he was unsuitable for the position, Gomez consulted Cooper and expressed concerns about placing plaintiff in the same position from which he had resigned because she believed it would have an adverse impact on the Horton Agency and the efficiency of services there based on plaintiff's prior performance problems, insubordination, and defiance toward the Superintendent. Cooper agreed with Gomez that plaintiff was not suitable for the Soil Conservationist position at the Horton Agency and testified that based upon plaintiff's prior conduct, it was not a difficult decision to find plaintiff unsuitable for the position.

The Anadarko Area Personnel Office did refer plaintiff as qualified and eligible for other position vacancies, including some at the Horton Agency. On August 11, 1993, the Anadarko Area Office referred plaintiff as an eligible applicant for the position of Rights Protection Specialist. The Anadarko Area Office also referred plaintiff as an eligible applicant for the Realty Specialist in the Horton Agency in 1993, and later in 1998, while Gomez was still the Personnel

Officer, plaintiff was referred for the Superintendent's position at the Horton Agency.

Waldo Leander, a nonIndian, whose date of birth was August 9, 1958, was ultimately selected as the new Soil Conservationist.

On April 11, 1995, plaintiff filed an EEO complaint of discrimination based on race, age and reprisal, which became BIA Complaint 95–027. On July 7, 1995, plaintiff's complaint of discrimination was accepted with the following allegation:

> You applied, were rated qualified (you allege you were the only qualified Indian Preference applicant), but not certified to the selecting official for the position of Soil Conservationist, GS–457–11, located at the Horton Agency, Horton Kansas .... You allege discrimination when Anadarko Area's Office of Personnel Management did not certify you to the selecting official for consideration ... even though in a letter dated December 16, 1993, OPM–Boyers, Pennsylvania, issued a decision that determined you to be suitable for Federal Employment and that your eligibility would provide you with full consideration for all position for which you qualify.

### Complaint of Discrimination 99–045

In 1998 and 1999, Claudia Wheeler was a Personnel Staffing Specialist with BIA in Anadarko, Oklahoma. Her job duties included recruiting and advertising vacancies, rating applicants, and issuing certificates of lists of eligible qualified applicants. Wheeler's office was responsible for advertising the vacancy for the Superintendent at the Horton Agency. Evaline Gomez was the Chief Personnel Officer at the time. Wheeler did not know plaintiff when the Superintendent's position was being advertised.

The position of Superintendent at the Horton agency was advertised three different times: from August 3, 1998 to September 2, 1998; from October 20, 1998 to November 19, 1998; and from November 30, 1998 to December 29, 1998. Plaintiff applied for the position the first time it was advertised. At that time, it was advertised as a GS–13 position. There were a total of eight applicants, including plaintiff. Of those eight, five, including plaintiff, were determined to meet the basic qualification requirements of the position. Those five candidates were referred to the selecting official without ranking them because there were five or fewer qualified candidates. The selecting official returned the certificate of eligible applicants without making a selection and requested that the position be readvertised.

Dan Deerinwater, the selecting official, was the Anadarko Area Director with supervisory responsibility over the Horton Agency when the Superintendent's vacancy was advertised in 1998. After the position was first advertised he received the certificate of eligible applicants with only five qualified applicants listed. Among those was plaintiff, Richard Beams. Deerinwater decided not to select any of the five candidates because he believed the applicant pool was too small and the vacancy announcement had not reached a large enough group of people who might be interested in the position. He also did not consider any of the five applicants to be superiorly qualified for the job. Deerinwater viewed plaintiff's experience as being primarily related to land operations, soil conservation, and realty. He viewed plaintiff as lacking experience in tribal operations, roads maintenance and construction, and in trust responsibility.

Deerinwater requested that the position be readvertised, which occurred from October 20, 1998, to November 19, 1998, but no new applicants applied. The original five qualified applicants, including plaintiff,

were carried forward for consideration as eligible applicants. When no new applicants applied in response to the second announcement, Deerinwater requested that the position be readvertised as a GS–12/13 with the goal of obtaining a broader pool of applicants from which to select. Deerinwater understood that the original five qualified candidates would be carried forward for consideration. At the time, Deerinwater knew of plaintiff and that plaintiff had problems in the past with the Horton Agency Superintendent. Deerinwater did not know that plaintiff had filed EEOC complaints until some time after the Superintendent's vacancy was filled.

The third advertisement of the Superintendent vacancy resulted in twenty-four applications, comprised of sixteen new applications and the eight applications received in response to the first advertisement. Of the twenty-four applicants, fifteen were determined to be qualified; these fifteen included the original five qualified applicants, whose applications had been carried forward. Plaintiff was included among the fifteen qualified applicants.

BIA regulations, specifically 44 Bureau of Indian Affairs Manual 335, (BIAM) subsection 1.17A, required the formation of a promotion panel because of the large number of qualified applicants and the grade level of the position. In forming the promotion panel, Wheeler served in an advisory capacity. Three panel members, all of whom held a position at the same or higher grade level of GS–12/13, were selected. The three panel members were Betty Tippeconnie, who was the Superintendent at the Anadarko Agency, Bruce Maytubby, who was a regional realty officer, and Galila Johnson, who was the Superintendent of the Concho Agency. The panel was convened in Anadarko on January 25, 1999.

Each member of the ranking panel was given fifteen applicant packages and a ranking sheet to rank each of the applicants in the areas of knowledge, skill and abilities with a score of 5 for being superiorly qualified and a score of 1 for being acceptably qualified based upon the information contained in each applicant's application. The panel members worked independently of each other in ranking the applicants.

Panel member Galila Johnson rated plaintiff as a 1 for knowledge of government programs, a 3 in managerial leadership ability and program management, a 3 in relationships within the BIA and the Indian Community, and a 1 on ability to communicate. Johnson knew plaintiff at the time, but she did not know that he had made EEO complaints. Panel member Betty Tippeconnie rated plaintiff with a 1 in all four of the categories based upon the information in plaintiff's application, the crediting plan, and the position description. Tippeconnie believed plaintiff had only an acceptable level of knowledge, skills and abilities. Tippeconnie did not know plaintiff nor that he had ever participated in any EEOC activity. Panel member Bruce Maytubby rated plaintiff as a 3 in two of the categories, a 1 in one of the categories, and a 2 in the other category. Maytubby knew plaintiff and knew he had some EEO activity, but he did not have any specific knowledge of plaintiff's complaints. The knowledge he had did not impact his ranking of plaintiff's application.

Claudia Wheeler totaled the scores given by the members of the ranking panel to each of the fifteen qualified applicants, which were recorded on the Summary of Panel Member Evaluation for Merit Promotion. Based on Wheeler's totaling of panel member scores, Johnson awarded plaintiff a total score of 8, Tippeconnie awarded plaintiff a total score of 4, and Maytubby, the only one with knowledge of plaintiff's EEO activity, awarded plaintiff

the highest total score of 9. The scores were added together by Wheeler and divided by three (the number of panel members) giving plaintiff a total average score of 7. Wheeler totaled and averaged the scores for each of the fifteen qualified applicants. Pursuant to 44 BIAM 335, Wheeler determined that a score of 12 was the cutoff point, meaning that only applicants with an average score of 12 or higher would be referred to the selecting official. With an average score of only 7, plaintiff was not referred to the selecting official. Five of the fifteen applicants scored at 12 or above, and they were referred on a certificate of eligibles to the selecting official. Galen Hubbard was selected from these final five applicants. Hubbard was the Administrative Officer at the Horton Agency, and Deerinwater selected Hubbard as the Superintendent based upon his knowledge, skills and abilities, his current location at the Horton Agency, and his existing relationship with other employees at the Horton Agency.

On June 14, 1999, plaintiff filed an EEOC complaint, which became BIA Complaint 99–045. On December 27, 2000, BIA accepted plaintiff's complaint of discrimination for processing of the following:

> You applied for Anadarko Area Vacancy Announcement Number AN–98–52, for the position of Superintendent, GS–340–13 ... which Opened: 8–03–98 and Closed 09–02–98. The position was readvertised under the same Anadarko Vacancy Number AN–98–52 ... that Operated 10–20–98 and Closed 11–19–98. The position was against readvertised under the same Anadarko Vacancy Announcement Number AN–98–52, but advertised as Superintendent, GS–340–12/13, that Opened 11–30–98 and Closed 12–29–98. In a letter dated April 15, 1999, the Anadarko Area Personnel Office informed you that you were rated qualified but not rated among the Best Qualified Group that was referred/certified to the selecting official.

## III. Discussion

Title VII makes it an unlawful practice for an employer "to fail to hire ... any individual ... because of such individual's ... sex," [33] and to discriminate against a job applicant because he has opposed an unlawful employment practice or "made a charge, testified, assisted or participated in any manner" in Title VII proceedings.[34] Title VII applies to federal employees.[35] The ADEA sets forth an analogous prohibition against discrimination based upon age in federal employee personnel actions.[36]

Absent direct evidence of discrimination, courts apply the legal standards announced in *McDonnell Douglas Corp v. Green*,[37] to Title VII and ADEA claims.[38] *McDonnell Douglas* and its progeny establish "an allocation of the burden of production and order for the presentation of proof ... in discriminatory-treatment cases." [39] "First, the plaintiff must establish a prima facie case of discrimination." [40] If the plaintiff makes out a prima facie

---

**33.** 42 U.S.C. § 2000e–2(a)(1).

**34.** 42 U.S.C. § 2000e–3(a).

**35.** *See* 42 U.S.C. § 2000e–16(a).

**36.** See 29 U.S.C. § 633a; *Villescas v. Abraham*, 311 F.3d 1253, 1257 (10th Cir.2002).

**37.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**38.** *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Sanchez v. Denver Pub. Schools,* 164 F.3d 527 (10th Cir. 2002) (ADEA and Title VII claims).

**39.** *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

**40.** *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097.

case, the burden shifts to the defendant to "produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate nondiscriminatory reason." [41] In the Tenth Circuit, the burden of proving a nondiscriminatory reason has been characterized as "exceedingly light." [42] If the defendant produces evidence showing a legitimate, nondiscriminatory reason for its alleged actions, "the *McDonnell Douglas* framework—with its presumptions and burdens—disappear[s] ... and the sole remaining issue [is] discrimination vel non ...." [43] In order to prevail at this stage, the plaintiff must demonstrate that the defendant's proffered explanation is not its true reason, but instead is a pretext for discrimination.[44] Although the intermediate evidentiary burdens shift back and forth under this framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." [45]

### BIA Complaint 91–031

In this claim, plaintiff contends that his resignation as Soil Conservationist constituted reverse sex discrimination and constructive discharge in violation of Title VII. When bringing a claim for reverse gender discrimination, the *Mc–Donnell Douglas* burden-shifting framework is modified because males belong not to a historically disfavored group, but rather, to a historically favored group.[46] Thus, when a member of a favored group alleges disparate treatment, "the courts have adjusted the prima facie case to reflect this specific context by requiring a showing of background circumstances which support the suspicion that the defendant is that unusual employer who discriminates against the majority." [47] A plaintiff can also state a prima facie case of reverse discrimination by presenting "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." [48]

■ Plaintiff has provided no direct evidence of discrimination, nor has he provided any indirect evidence sufficient to support a reasonable probability that he suffered a constructive discharge because of his sex. The incidents to which plaintiff refers to support his sex discrimination claim demonstrate at best a personality conflict between plaintiff and Saunders. Plaintiff essentially claims that Saunders and the Reality Department personnel were incompetent and that he could have better served the Horton Agency. This incompetence, plaintiff asserts, resulted in an increased workload for him, which even a diligent employee would have been unable to handle, and thus, he was unjustly terminated. When plaintiff was presented with the proposed suspension by Saunders, he immediately

---

**41.** *Id.*

**42.** *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir.), *cert. denied*, 528 U.S. 814, 120 S.Ct. 50, 145 L.Ed.2d 44 (1999).

**43.** *Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097.

**44.** *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir.2004).

**45.** *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

**46.** *See Livingston v. Roadway Express, Inc.*, 802 F.2d 1250, 1252–53 (10th Cir.1986).

**47.** *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 248 (10th Cir.1992).

**48.** *Notari v. Denver Water Dept.*, 971 F.2d 585, 590 (10th Cir.1992); *see also Mattioda v. White*, 323 F.3d 1288, 1293 (10th Cir.2003) (noting that "Notari continues to operate as Tenth Circuit precedent").

submitted written notice that he was resigning "as a result of [her] continued misrepresentation of the truth regarding [his] work and [his] intentions in [his] work." Plaintiff made no reference to sex discrimination as a basis for his resignation. Plaintiff forgets that his claim is for gender discrimination, not wrongful termination without just cause. In fact, plaintiff claims that after he resigned "Ms. Saunders harassed some female employees to the point that plaintiff was told that Antionette Houle, Reality Specialist, was considering quitting also." Plaintiff may have demonstrated that Saunders was a difficult supervisor who engendered conflict, but he has not provided even a hint of evidence that this conflict occurred because of his sex.

Plaintiff also produced no background circumstances which support the suspicion that the defendant is that unusual employer who discriminates against the majority. To the contrary, plaintiff's averments support the conclusion that even if Saunders actions could somehow be construed to constitute discrimination, she discriminated equally against both male and female employees. It is uncontroverted that Saunders was a demanding supervisor with all employees, and that she had to deal with work related problems with female employees as well as plaintiff. She gave a minimally successful performance evaluation to one female employee and counseled another female employee about deficiencies in her performance. Unlike plaintiff, the female employees did not feel compelled to resign because of Saunders' corrective action, but instead corrected the deficiencies addressed by Saunders. Plaintiff has not shown that Saunders was the unusual employer who discriminates against the majority and consequently, has not established a prima facie case of discrimination.

Even, assuming, *arguendo*, that plaintiff had established a prima facie case of reverse gender discrimination, summary judgment would still be appropriate because defendant has articulated legitimate nondiscriminatory reasons for its actions. The uncontroverted facts establish that even prior to Saunders' tenure as Supervisor, Brian Pogue encountered problems with plaintiff's work in the Horton agency and determined that plaintiff's record keeping system was deficient and that plaintiff interfered with Pogue's appraisal duties. Moreover, plaintiff failed to perform his job duties over at least a six-month period during Saunders' tenure; he was counseled about his deficiencies and he ignored his supervisors' orders. Six months before the proposed suspension, plaintiff was instructed to prioritize his job tasks to bring his leasing activities current and to provide completed tasks to his supervisors, but plaintiff's work product continued to be inadequate. Plaintiff was told to stop involving himself in matters other than the completion of farm plans; instead he attended a lease sale and visited the Jackson County Road Supervisor, Ronald Karn, to discuss a road right-of-way closure in direct contravention of his supervisor's orders. While visiting with Karn, plaintiff gave Karn the impression that plaintiff had the authority to make demands related to road right-of-ways. This caused Karn to call Saunders with his concerns and Saunders confirmed that plaintiff neither had the authority, nor the responsibility to make road right-of-way decisions.

Plaintiff's insubordinate conduct continued even after he was counseled about this actions. On March 22, 1991, Shadwick met with plaintiff to discuss his failure to finish the farm plans and his conversation with Karn concerning the road right-of-way. During the meeting, plaintiff became defensive, walked out, and had to be

placed on administrative leave for the remainder of the day as a result of his conduct. Additionally, in early April of 1991, Saunders determined that plaintiff had inappropriately discussed with the Jackson County Sheriff plaintiff's belief that marijuana was being grown on a certain leased tract. Plaintiff's actions culminated in a April 19, 1991, meeting in which Saunders gave plaintiff a proposed fourteen day suspension. In response, plaintiff immediately resigned.

The Court concludes that defendant had legitimate nondiscriminatory reasons for presenting plaintiff with the notice of suspension. Plaintiff had demonstrated a pattern of insubordinate conduct, and deficient work product. Both are legitimate nondiscriminatory reasons to fire an employee.[49] Plaintiff has produced no evidence that defendant's proffered reason for his suspension was not the true reason for its actions, other than his own conclusory views about his performance at the Horton agency. Plaintiff has not produced any evidence that the alleged deficiencies in his work product that were documented over at least a six month period were merely imagined by defendant. As such, plaintiff has also failed to show that defendant's explanation for his suspension was a pretext for discrimination.

■ To the extent plaintiff alleges a constructive discharge because of his sex, his claim similarly fails. Constructive discharge occurs "when the employer, by its illegal discriminatory acts, has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."[50] A plaintiff's subjective views are irrelevant as a plain-

tiff must objectively demonstrate that he had "no other choice but to quit."[51]

■ As previously discussed, there is no evidence that plaintiff was given the proposed suspension because of his male gender. Indeed, even before receiving the proposed suspension, plaintiff told the Anadarko Area Personnel Officer that he was going to resign because he was very unhappy, he did not like Saunders and could not work with her because "she was just too pushy." After being presented with the proposed suspension, he said that he was resigning because "sometimes a man's gotta do what he's gotta do," not because he had been unfairly treated because of his gender.

More importantly, plaintiff has not demonstrated that he was left with no other choice but to resign. Plaintiff voluntary resigned when presented with the proposed fourteen day suspension. This was merely a proposed suspension to which plaintiff was allowed an opportunity to respond before the suspension took effect. Plaintiff never responded to the proposal, nor discussed the proposed suspension with the Area Director, who made the final suspension determination, before resigning. On April 19, and 22, 1991, Galen Hubbard met with plaintiff and encouraged him not to resign. Hubbard suggested several alternatives to resignation so that plaintiff could continue his employment with the government. Plaintiff rejected these suggestions. Thus, not only has plaintiff not demonstrated that he was discharged because of his sex, but he has not shown that he had no other choice but to quit. His constructive discharge claim fails as a matter of law.

---

**49.** *E.g., Birdwhistle v. Kansas Power & Light Co.,* 723 F.Supp. 570, 574 (D.Kan.1989) (insubordination); *McCue v. State of Kansas, Dep't of Human Res.,* 938 F.Supp. 718, 724 (D.Kan.1996) (poor work performance).

**50.** *Sanchez v. Denver Public Schools,* 164 F.3d 527, 534 (10th Cir.1998).

**51.** *Id.*

## BIA Complaint 94–052

In BIA Complaint 94–052, plaintiff claims his confrontation with Saunders in January 1994 regarding the OPM letter constituted retaliation in violation of Title VII. The OPM letter indicated that plaintiff had never been disbarred from federal employment and that his application would be referred to agencies as vacancies arose. Yet, plaintiff construed this letter as guaranteeing him the position of Soil Conservationist at the Horton agency, a position that had already been filled by Eugene Harter, and demanded to be re-employed in his former position. Saunders disagreed and refused to rehire plaintiff. These allegations alone form the basis of BIA Complaint 94–052.[52]

█ A prima facie showing of retaliation requires proof that: "(1) the plaintiff engaged in protected opposition or participated in a Title VII proceeding; (2) the employer acted adversely subsequent to or contemporaneous with employee activity; and (3) there is causal connection between plaintiff's activity and the employer's action." [53] There is no dispute that filing plaintiff's prior EEO complaint constitute protected activity.

█ The second prong of a prima facie case requires proof of an adverse employment action. An adverse employment action constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." [54] In a claim for failure to hire, *McDonnell Douglas* "demand[s] that the alleged discriminatee demonstrate at least that his rejection did not result from the absence of a vacancy in the job sought." [55] Consequently, "there can be no finding of an adverse employment action if there was no vacancy at the time plaintiff applied or the position was never filled." [56] Here, it is uncontroverted that the position of Soil Conservationist was not vacant when plaintiff demanded that he be rehired in that capacity. Eugene Harter was serving as Soil Conservationist at the Horton agency at that time. Consequently, plaintiff has failed to demonstrate an adverse employment action

█ Plaintiff also fails to satisfy the third prong of his prima facie case of retaliation. He fails to demonstrate a causal connection between his filing of EEO complaints and Saunders' refusal to rehire him. "The causal-connection element of a prima facie retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity." [57] A plaintiff may also establish a "causal connection by proffer-

---

**52.** Plaintiff attempts to relate this claim to the original decision to remove his name from the list of eligible applicants for the Soil Conservationist vacancy that was created by plaintiff's 1991 resignation, and that was filled in 1992 by Harter. This claim, however, has already been litigated in *Beams v. Norton*, 256 F.Supp.2d 1203, 1215–16 (D.Kan.2003) and plaintiff is estopped from relitigating this matter. *See Augustine v. Adams*, 88 F.Supp.2d 1166, 1170 (D.Kan.2000) (discussing issue and claim preclusion).

**53.** *Mattioda v. White*, 323 F.3d 1288, 1293 (10th Cir.2003).

**54.** *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1237 (10th Cir.2004).

**55.** *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

**56.** *Morgan v. Fed. Home Loan Mortgage, Corp.*, 172 F.Supp.2d 98, 112–13 (D.D.C. 2001).

**57.** *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir.2003).

ing evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." [58] Plaintiff has not shown that Saunders refused to rehire him because of his prior EEO activity; nor does a temporal proximity exist to create an inference of retaliatory motive. It had been approximately three years since plaintiff filed his EEO complaint alleging that he was unlawfully terminated in violation of Title VII. Even a three-month time period, standing alone, is insufficient to establish causation.[59] Clearly a three year time period is much too long to establish a causal connection.

■ Even if plaintiff had established a prima facie case of retaliation, defendant has articulated legitimate, non-discriminatory reasons for its failure to rehire plaintiff. First, the position sought by plaintiff was not vacant, but rather was already filled by Eugene Harter. Additionally, plaintiff had already proven his inability to fulfill the responsibility of the Soil Conservationist along with his inability to follow direction from the position's supervisor. When plaintiff was the Soil Conservationist, he demonstrated his incompetence and was routinely insubordinate. The Court concludes that defendant articulated legitimate reasons suggesting that its decision was not motivated by discriminatory intent. Plaintiff offers no evidence to suggest these reasons are merely pretextual. Consequently, summary judgment is proper on plaintiff's retaliation claim relating to BIA Complaint 94–052.

### BIA Complaint 95–027

In BIA Complaint 95–027, plaintiff claims that he was discriminated against on the basis of age, race and reprisal when he was not certified as a qualified applicant for the Soil Conservationist position in the Spring of 1994. The Court addresses each of plaintiff's claims in turn.

### Race and Age Discrimination

■ To prove a prima facie case for discriminatory failure to hire, plaintiff must prove that: (1) he belongs to a protected class; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite being qualified, he was rejected; and (4) after his rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications.[60] For a race discrimination claim, a plaintiff need not establish that defendant hired someone outside the protected class to make out a prima facie case of race discrimination.[61] However, an age discrimination claim under the ADEA requires proof that the person hired was younger than the plaintiff.[62] The prima facie case for both race and age claims requires a plaintiff to eliminate the most common nondiscriminatory reasons for not hiring an applicant, including lack of qualifications and absence of a vacancy.[63]

■ It is not disputed that plaintiff belonged to a protected class, applied for the position of Soil Conservationist and that someone outside the protected class was hired in the position. Defendant hired

58. *Annett v. Univ. of Kansas,* 371 F.3d at 1239–40.

59. *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999).

60. *Garcia v. Pueblo Country Club,* 299 F.3d 1233, 1238 (10th Cir.2002) (quoting *Kendrick v. Penske Transp. Services Inc.,* 220 F.3d 1220, 1226 (10th Cir.2000)).

61. *Kendrick,* 220 F.3d at 1226.

62. *Ellis v. United Airlines, Inc.,* 73 F.3d 999, 1004 (10th Cir.), *cert denied,* 517 U.S. 1245, 116 S.Ct. 2500, 135 L.Ed.2d 191 (1996); *Beams v. Norton,* 256 F.Supp.2d 1203, 1214 (D.Kan.2003).

63. *Kendrick,* 220 F.3d at 1226–27.

Waldo Leander, a non-Indian who was younger than plaintiff, to fill the Soil Conservationist vacancy. Nevertheless, defendant argues that plaintiff fails to satisfy his prima facie case because he cannot prove that he was a qualified applicant for the Soil Conservationist position. In support of this argument, defendant relies upon plaintiff's inability to fulfill the responsibilities of the job in his previous stint as Soil Conservationist. Plaintiff was, however, technically qualified for the position; he met the experience and educational requirements for the Soil Conservationist vacancy. Gomez simply determined that although plaintiff was technically qualified for the position, he was not a suitable candidate for Soil Conservationist because of his prior conduct in the position. The Court, bearing in mind that the burden imposed on a plaintiff at the prima facie stage is not onerous,[64] concludes that plaintiff has stated a prima facie case of race and age discrimination.

Despite plaintiff proving a prima face case of discrimination, his claims still fail because defendant has articulated legitimate, nondiscriminatory reasons for its actions, and plaintiff has failed to show that these reasons were pretextual. As previously discussed in connection with BIA Complain 91–031,[65] plaintiff had already demonstrated incompetence in the position of Soil Conservationist. He did not complete assignments on time and interfered in matters outside his job responsibilities. In addition, he was insubordinate and repeatedly denied his supervisors' requests. Poor work habits and insubordination both constitute legitimate nondiscriminatory reasons for defendant's decision not to rate

plaintiff as suitable for the Soil Conservationist position.[66] Plaintiff has not suggested that defendant's proffered reasons for its actions were merely a pretext and not the true reasons for its actions. As such, defendant's motion for summary judgment on plaintiff's age and race discrimination claims related to BIA Complaint 95–027 must be granted.

## Retaliation

Plaintiff claims that he was not rated as suitable for the position of Soil Conservationist because of his prior EEO complaints. To establish a prima facie case of retaliation, plaintiff must show that he engaged in protected activity, suffered an adverse employment action, and that there was a causal connection between the two. It is uncontested that plaintiff's prior EEO filings constitute protected activity and that defendant's failure to hire plaintiff as the Soil Conservationist at the Horton Agency resulted in an adverse employment action.

 To prove his prima facie case, plaintiff must also show that there was a causal connection between his prior EEO complaints and defendant's decision to rate him unsuitable for the Soil Conservationist vacancy. Plaintiff must prove either that the employer's motive for taking the adverse action was its retaliatory desire, or that circumstances exist, such as temporal proximity, which justify an inference of retaliatory motive.[67] Plaintiff has not shown that Gomez sought to retaliate against him because of his prior EEO activity. Indeed, plaintiff credits Gomez with encouraging him to file an EEO com-

---

64. *Tungol v. Certainteed Corp.*, 202 F.Supp.2d 1189, 1197 (D.Kan.2002).

65. *See infra* p. 1151–52.

66. See *e.g.*, *Birdwhistle v. Kansas Power & Light Co.*, 723 F.Supp. 570, 574 (D.Kan.1989)

(insubordination); *McCue v. State of Kansas, Dep't of Human Res.*, 938 F.Supp. 718, 724 (D.Kan.1996) (poor work performance).

67. *See Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1218 (10th Cir.2003); *Annett v. Univ. of Kansas*, 371 F.3d at 1239–40.

plaint when he resigned from the Horton agency in 1991. Moreover, the Anadarko Area Personnel Office referred plaintiff as qualified for other vacancies, including openings at the Horton Agency. For instance, while Gomez was still the personnel officer, plaintiff was referred for the Superintendent's position at Horton.

Nor has plaintiff established a temporal proximity sufficient to create an inference of retaliation. To the Court's knowledge, plaintiff's most recent prior EEO complaint was filed on March 1, 1994. The EEO complaint at issue in this retaliation claim was not filed until April 11, 1995. A thirteen month gap between an EEO filing and an adverse employment action is insufficient, in itself, to establish a causal connection.[68] Thus, the Court concludes that plaintiff has failed to prove a prima facie case of retaliation.

Even supposing plaintiff had established a prima facie case of retaliation, his claim would still fail because defendant's professed reasons for its actions, plaintiff's incompetence and insubordination, are, as repeatedly discussed by the Court, legitimate nondiscriminatory reasons for defendant's actions. Plaintiff has not suggested that defendant's decision not to rate him as suitable was motivated by anything other than his past incompetence in the identical position for which he sought employment, and his past insubordinate attitude toward the individual who would supervise him if he were deemed suitable and ultimately hired as the Soil Conservationist. As such, plaintiff has failed to show that the reasons advanced by defendant for not certifying him as suitable were a pretext for unlawful discrimination. Plaintiff's retaliation claim fails as a matter of law.

**BIA Complaint 99–045**

In his final BIA Complaint, plaintiff claims that defendant's failure to select him as Superintendent for the Horton agency in 1999 was in retaliation for his prior EEO filings. This claim too fails as plaintiff has not established a prima facie case of retaliation nor shown that defendant's professed reason for its actions was in reality a pretext for unlawful discrimination.

To establish a prima facie case of retaliation, plaintiff must show that he engaged in protected activity, suffered an adverse employment action, and that there was a causal connection between the two. There is no question that plaintiff had engaged in protected activity by filing EEO complaints or that defendant's refusal to hire plaintiff resulted in an adverse employment action. The downgrade of the position from a GS 13 to a GS 12 level, though, was not an adverse employment action because plaintiff's name was always included in the list of qualified applicants.

■ Plaintiff, however, must still show a causal connection between his previous activity and the defendant's decision not to hire him. Plaintiff has made absolutely no attempt to show the requisite causal connection. In fact, in his "Response to Defendant's Statement of Facts," plaintiff only responds to one of the thirty-one uncontested facts related to this claim and this response is completely irrelevant to the causal connection showing. Moreover, only one person involved in the process for selecting the Superintendent knew that plaintiff had filed EEO complaints; a panel member who ranked plaintiff and whose rankings were responsible for paring down the number of applicants, knew that plaintiff had engaged in protected activity, but

---

**68.** *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (Even a three-month time period, standing alone, is insufficient to establish causation).

he ranked plaintiff higher than any other member of the panel. No evidence disputes his testimony that his knowledge of plaintiff's prior EEO activity did not affect his rankings of plaintiff. Nor is there a sufficient temporal proximity for the Court to assume a causal connection; plaintiff's most recent EEO complaint had been filed in 1995, approximately four years before the alleged adverse employment action. Plaintiff has, thus, failed to demonstrate a prima facie case of unlawful retaliation.

■■■ Even if plaintiff had established a prima facie case, his claim would still fail as defendant has articulated legitimate, nondiscriminatory reasons for failing to hire plaintiff as Superintendent, and plaintiff does not suggest that these reasons are a pretext to hide defendant's true intentions. First, the downgrading of the position from a GS level 13 to GS level 12, even if it did constitute an adverse action, was for the purpose of increasing the applicant pool for an important supervisory position above five and constitutes a legitimate nondiscriminatory reason for defendant's actions. Secondly, plaintiff did not make the final cut of applicants because he failed to score high enough in the areas of knowledge of government programs, managerial leadership ability and program management, relationships within the BIA and the Indian Community, and ability to communicate. Defendant has shown plaintiff was not selected because he was not qualified, not because he had previously filed EEO complaints. The only evidence plaintiff offers to suggest that the selection process was unfair is a favorable statement from a Supervisor in 1990, but this evidence is not relevant. The opinions of plaintiff's supervisor in 1990 have no bearing on whether the Panel members fairly evaluated plaintiff in 1999. As such, plaintiff fails to show that defendant's articulated reasons for its actions were merely pretextual and this claim fails as a matter of law.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment is GRANTED and this case is dismissed.

IT IS SO ORDERED.